IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| WILLIAM R. ALEXANDER, | ) | CASE NO. 1:07 cv 3309 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | MAGISTRATE JUDGE McHARGH |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | **MEMORANDUM OPINION** |
| Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

This case is before the Magistrate Judge pursuant to Local Rule. The issue before the undersigned is whether the final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff William Alexander II's application for Disability Insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423, and Supplemental Security Income benefits under Title XVI of the Social Security Act, 42 U.S.C. § 1381 et seq., is supported by substantial evidence and, therefore, conclusive.

For the reasons set forth below, the Court AFFIRMS the decision of the Commissioner.

## I. PROCEDURAL HISTORY

On June 23, 2004, Plaintiff filed an application for Disability Insurance benefits and Supplemental Security Income benefits, alleging a disability onset date of May 5, 2004 (Tr. 92). Plaintiff alleges he is disabled due to an inability to ambulate effectively without a cane after fracturing his leg when a horse fell on him (Tr. 43-44). On November 1, 2006, Administrative Law

Judge ("ALJ") Alfred V. Lucas held a hearing at which Plaintiff, represented by counsel, testified. Vocational expert ("VE") Nancy J. Borgeson, Ph.D., also testified.  The ALJ determined Plaintiff had the residual functional capacity ("RFC") to perform the exertional demands of sedentary work and, therefore, was not disabled (Tr. 23-24).  Specifically, the ALJ found that Plaintiff had the RFC to lift and carry up to 20 pounds occasionally and 10 pounds frequently; sit for 6 hours of an 8-hour workday; and stand for 2 hours of an 8-hour workday (Tr. 20).  The ALJ therefore denied Plaintiff Disability Insurance benefits.  The ALJ's decision was, however, partially favorable to Plaintiff. Under Medical-Vocational Rule 201.99, which looks to age, education, work experience and RFC, Plaintiff became 'disabled' on November 21, 2006, his fiftieth birthday (Tr. 24).[1]  Thus, Plaintiff is eligible for Supplemental Security Income benefits as of that date.  On appeal, Plaintiff claims that the ALJ's decision regarding his pre-November 21, 2006,[2] disability status is not supported by substantial evidence, that Plaintiff's medical condition meets or equals Listing §1.02(A), and that the ALJ erred in his credibility analysis of Plaintiff.

## II.  EVIDENCE

### A.  Personal and Vocational Evidence

Born on November 22, 1956 (age 50 at the time of the ALJ's determination), Plaintiff is an "individual closely approaching advanced age."  *See* 20 C.F.R. §§ 404.1563 and 416.963.  Plaintiff last completed the seventh grade and has past relevant work as an exercise rider and a valet (Tr. 107).  Plaintiff has not engaged in substantial gainful activity since May 5, 2004, his alleged onset date of disability.

---

[1] Plaintiff's actual birth date is November **22**, 1956.  The ALJ incorrectly references November 21, 2006 as Plaintiff's 50th birthday and onset of disability status.

[2] Plaintiff appeals the ALJ's determination of non-disability status prior to his true 50th birthday, November **22**, 2006.

**B.  Medical Evidence**

The medical record shows that Plaintiff sustained a right hip fracture when a horse fell on him on May 5, 2004 (Tr. 185).  X-rays showed a comminuted right hip fracture, and Plaintiff subsequently underwent open reduction internal fixation (ORIF) surgery with rodding (Tr. 155, 182-85).  Post-operatively, Plaintiff received skilled nursing care (Tr. 155-71) and underwent occupational and physical therapy (Tr. 148-53).  Plaintiff was discharged in mid-June 2004, on crutches with a recommendation of outpatient physical therapy (Tr. 153).

In June 2004, Plaintiff consulted Audley Mackel, III, M.D., the orthopaedic specialist who performed the ORIF procedure, for post-surgical follow-up care (Tr. 180).  Dr. Mackel noted that Plaintiff had supple range of motion of hip, intact neurovascular status, tenderness along the medial aspect of the knee, and decreased swelling (Id.).  He reported that Plaintiff's x-rays revealed healing (Tr. 180-81).  Dr. Mackel recommended an exercise program, home physical therapy, and a follow-up appointment in four to six weeks (Tr. 180).

On June 25, 2004, Carl Kelly, M.D., Plaintiff's primary care physician who had also provided post-operative care (Tr. 143), completed a form entitled "Basic Medical" for the Social Security Administration (Tr. 144-46). Dr. Kelly noted that Plaintiff had several diagnoses, including right hip fracture and alcohol abuse (Tr. 145).  Dr. Kelly reported the onset date of Plaintiff's condition as May 11, 2004, and stated that Plaintiff's condition was improving with treatment (Tr. 145).  Dr. Kelly opined that Plaintiff could sit for 4 hours in an 8-hour workday, 2 hours without interruption; stand/walk for 2 hours in an 8-hour workday, one half-hour without interruption; and that his lifting and carrying was impaired because Plaintiff walked with crutches (Tr. 144).  Dr. Kelly also advised that Plaintiff had extreme limitations in pushing/pulling, bending, and repetitive foot movements, and had marked limitations in reaching and handling (Id.).  Dr. Kelly opined that

Plaintiff was unemployable due to these limitations, and that the limitations were expected to last between thirty days and nine months (Tr. 144, 146).

In August 2004, Dr. Kelly completed a form entitled "Mental Functional Capacity Assessment" for the Social Security Administration, in which he noted Plaintiff had moderate and marked limitations in mental functioning (Tr. 175).  That same month, Dr. Mackel again met with Plaintiff and reported that Plaintiff's follow-up x-rays indicated a right proximal femur subtrochanteric and intertrochanteric fracture in good alignment position, with advanced healing (Tr. 178-79).  Dr. Mackel also noted that Plaintiff was now using a cane to ambulate and receiving home physical therapy (Tr. 178).  Dr. Mackel recommended outpatient therapy and an exercise program (Id.).  He estimated Plaintiff's return-to-work date as March 1, 2005, at light duty capacity (Id.).

In September 2004, Dr. Kelly provided two reports to the state Bureau of Disability Determination (Tr. 186-87, 191-92).  In these, Dr. Kelly provided Plaintiff's medical history going back to March 2000 (Id.).  With respect to his right hip injury, Dr. Kelly reported that Plaintiff was undergoing rehabilitation, had difficulty ambulating, and had marked muscle weakness with degenerative upper leg muscles and decreased range of motion of the right leg (Tr. 187, 191).  The report noted that Plaintiff had difficulty dressing but was able to finish the process (Id.).  Dr. Kelly once again opined that Plaintiff was unemployable due to his illiteracy and alcohol abuse (Tr. 187, 192).

In October 2004, Plaintiff complained of severe right knee and hip pain and subsequently underwent surgery to remove a protruding screw in his right leg in November 2004 (Tr. 140-41, 194-204).  Dr. Kim L. Stearns, M.D., performed the surgery to remove the painful hardware (Tr. 198).

In January 2005, on a second state agency questionnaire, Dr. Kelly reported that Plaintiff had

muscle atrophy, deformity of the distal lateral femur, reduced position of the knee, and shortening of the right leg (Tr. 137). Dr. Kelly noted that Plaintiff required a cane to ambulate and that Plaintiff complained of pain in the ribs and pelvis (Id.). In his January 2005 progress report, Dr. Kelly noted that Plaintiff's leg was improving, and although still experiencing severe right knee and hip pain, Plaintiff was able to walk fast without much difficulty (Tr. 137, 139). In February 2005, Dr. Kelly again noted that Plaintiff's mobility was improving (Tr. 139).

Plaintiff's medical record was reviewed on two separate occasions by different state agency physicians. In September 2004, Dr. Edmond Gardner, M.D., completed an initial Disability Determination and Transmittal form (Tr. 77). In February 2005, Plaintiff's medical record was reviewed by state agency physician Dr. Augusto Pangalangan, M.D. (Tr. 205-12). He also completed a Disability Determination and Transmittal form for Plaintiff (Tr. 78). Dr. Pangalangan opined that Plaintiff could lift 20 pounds occasionally, 10 pounds frequently; stand and/or walk at least 2 hours in and 8-hour workday; sit 6 hours in an 8-hour workday; occasionally push/pull and use foot controls with his right foot; occasionally climb ramps or stairs; never climb ladders, ropes or scaffolds; never balance, stoop, kneel, crouch, or crawl; and should avoid hazards such as machinery and heights (Tr. 206-07).

In approximately March 2005, Plaintiff fell on his hip which resulted in increased difficulty walking, although Plaintiff did not seek immediate medical attention (Tr. 64, 65, 138). On April 27, 2005, a hip x-ray revealed exuberant callus formation and heterotopic bone about the right femur post-internal fixation, but no fracture or dislocation (Tr. 147). In May 2005, Dr. Kelly referred Plaintiff to Dr. Stearns, the orthopaedist who removed Plaintiff's painful hardware, for evaluation (Tr. 215). Dr. Stearns noted that Plaintiff ambulated with an antalgic gait, was using crutches, and had tenderness and limited motion secondary to right hip pain (Tr. 222). She also reported

Plaintiff's fracture to be well healed (Id.). Dr. Stearns diagnosed a sprain/contusion and recommended therapy (Id.).

In July 2005, Plaintiff consulted Dr. Kelly, complaining of right knee tenderness, despite taking Percocet for pain management (Tr. 215). Plaintiff underwent an MRI of the right knee, which revealed post-surgical changes with expected post-surgical findings and a crescentic shaped abnormality that may have represented an area of osteochondral injury or avascular necrosis, among other possibilities (Tr. 213). Dr. Stearns also reviewed the MRI and recommended arthroscopic evaluation and debridement (Tr. 220). By January 2006, Plaintiff's pain had improved, and Dr. Kelly continued him on the same pain medication (Tr. 224).

In September 2006, Plaintiff was seen by Kaiser Permanente physicians several times (Tr. 229-48). On two occasions, Plaintiff presented complaining of right hip pain (Tr. 237-41). Plaintiff's x-rays revealed a healed right hip fracture with intact hardware, and negligible arthritic changes (Tr. 238). On September 20, 2006, Plaintiff was brought to the Emergency Department by his wife and diagnosed with confusion secondary to alcohol intake (Tr. 232-33), after drinking a twelve pack of beer that day (Tr. 235). Plaintiff admitted to being a chronic drinker of two (Tr. 236) or three (Tr. 232) six packs of beer daily, but said he had recently cut back to eight beers a day (Tr. 236). Plaintiff was admitted overnight and diagnosed with confusion, alcoholism, and hypertension (Tr. 231). On examination, Plaintiff had an intact neurological examination, displaying 5/5 motor, 5/5 sensory, 2+ reflexes, a limp from an old right leg injury, normal speech, and the ability to stand on his heels and toes (Tr. 236). Initially, Plaintiff stated he was not interested in an alcohol detoxification program (Tr. 236), but later indicated he wished to enter an inpatient chemical dependency program (Tr. 229, 230).

**C. Hearing Testimony**

On November 1, 2006, Plaintiff testified at an administrative hearing before ALJ Alfred V. Lucas.  Plaintiff testified that he was born in 1956, left school in the seventh grade, and could read and write (Tr. 38-40).  Plaintiff stated that a horse fell on him on May 5, 2004, and he subsequently had surgical insertion of a rod and screws into his leg and hip (Tr. 43-44).  Plaintiff worked as an exercise rider and valet saddling horses before the accident, and tried to work for two months after the accident performing various jobs, including post-break riding and grooming (Tr. 40-42). Plaintiff testified that after injuring his leg and hip, he last worked at a racetrack in 2005 (Tr. 40-42). Plaintiff stated that he had a total of two surgeries in addition to physical therapy related to the May 2004 accident (Tr. 47-50).  After the first surgery he was in a wheelchair for several weeks, used two crutches for one month, and thereafter used a cane to ambulate (Tr. 48).  Plaintiff stated that he still uses the cane to ambulate (Id.).  Plaintiff had some of the original surgical hardware removed in November 2004 (Tr. 43).

Plaintiff testified that after the November 2004 surgery, he could stand for about 15 minutes and walk about a quarter of a mile with the aid of his cane (Tr. 50-51).  He further testified that he could walk about a quarter of a mile without the cane, but it would be more painful than with the cane (Tr. 51-52).  Plaintiff said that he could sit straight up in a chair for about one half-hour at a time (Tr. 52).  Plaintiff stated that he could only walk up and down three steps (Id.).  Plaintiff had difficulty bending and squatting and could lift 5 to 8 pounds (Tr. 53).  He reported that his doctors have recommended additional surgery to remove the surgical hardware, that he stay away from horses, and that he stay off his leg but keep it exercised (Tr. 63-64).

Plaintiff stated that, currently, he can stand for one half-hour to forty-five minutes at a time; walk about a quarter of a mile; and sit straight up in a chair for about one half-hour at a time (Tr. 55-

56).  He said that he can remain seated longer if able to sit in a reclining position with his right leg extended (Id.).  Plaintiff also stated that he could lift about 20 to 25 pounds (Tr. 57-58).  Plaintiff stated that he performs physical therapy exercises daily (Tr. 58).  He testified that he had difficulty bathing and dressing, but was able to feed himself, cook, wash dishes, attend church weekly, and watch television (Tr. 59-61, 65).

The ALJ also questioned Plaintiff about his alcohol use (Tr. 66-70).  Plaintiff stated that he used to drink a 12 pack of beer each day but stopped drinking one month prior to the hearing (Tr. 66).  Plaintiff testified that he once attended a treatment program at Stella Maris and currently attended AA meetings three nights a week (Tr. 67).

Vocational expert ("VE") Nancy Borgeson also testified at Plaintiff's administrative hearing (Tr. 70-75, 90).  The VE classified Plaintiff's past relevant work as an exercise rider as medium, semi-skilled, and as a valet as light, unskilled (Tr. 72).  The ALJ asked the VE to consider a hypothetical person with Plaintiff's vocational characteristics and who was limited to a range of sedentary work that entailed lifting 20 pounds occasionally, and 10 pounds frequently with his arms and hands; standing and walking for 2 hours per day; sitting for 6 hours per day; walking for at least 2 hours, up to a maximum of 4 hours per day; occasionally using right-sided foot controls or his right leg for pushing; occasional climbing of ramps and stairs; never balancing, stooping, kneeling, crouching or crawling; avoiding hazards such as unprotected heights and moving machinery; and using a cane for assistance in ambulation and standing (Tr. 73).  The VE testified that the individual could perform sedentary, unskilled jobs such as a visual inspector (*e.g.*, film inspector) (450 local jobs; 2,300 state jobs; 41,000 national jobs); sedentary unskilled assembler (*e.g.*, lamp shade assembler) (2,150 local jobs; 10,000 state jobs; 164,000 national jobs); and order clerk for the food and beverage industry (400 local jobs; 2,000 state jobs; 48,000 national jobs) (Tr. 73-74).  The ALJ

also asked the VE to consider the same hypothetical with the added limitation of alcohol abuse and any work-related difficulties it would cause (Tr. 74). The VE testified that no full-time jobs exist to accommodate a hypothetical person with the added alcohol abuse limitation (Id.). Plaintiff's attorney then asked the VE to consider the initial hypothetical person with the addition of Plaintiff's need to recline in a chair with his right leg extended (Id.). The VE testified that such a person could not perform any of the sedentary assembly or inspection positions she had previously identified (Tr. 75).

### III. DISABILITY STANDARD

A claimant is entitled to receive Supplemental Security Income benefits only when he establishes disability within the meaning of the Social Security Act. *See* 42 U.S.C. §§ 423, 1381. A claimant is considered disabled when he cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months." *See* 20. C.F.R. §§ 404.1505, 416.905.

### IV. STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether, based on the record as a whole, the Commissioner's decision is supported by substantial evidence, and whether, in making that decision, the Commissioner employed the proper legal standards. *See Cunningham v. Apfel*, 12 Fed. Appx. 361, 362 (6th Cir. June 15, 2001); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984); *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "Substantial evidence" has been defined as more than a scintilla of evidence but less than a

preponderance of the evidence. *See Kirk v. Secretary of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981). Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed. *Id.* Indeed, the Commissioner's determination, if supported by substantial evidence, must stand, regardless of whether this Court would resolve the issues of fact in dispute differently or substantial evidence also supports the opposite conclusion. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).

This Court may not try this case de novo, resolve conflicts in the evidence, or decide questions of credibility. *See Garner*, 745 F.2d at 387. However, it may examine all evidence in the record in making its decision, regardless of whether such evidence was cited in the Commissioner's final decision. *See Walker v. Secretary of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).

## V. ANALYSIS

Plaintiff claims that the ALJ erred in determining that he was not disabled prior to November 21, 2006. Specifically, Plaintiff alleges that his impairment met or equaled the medical severity of Listing § 1.02(A); that the ALJ was required to obtain the opinion of a medical expert regarding medical equivalence; and that the ALJ erred in his credibility analysis of Plaintiff. However, substantial evidence supports the ALJ's determination that Plaintiff was not disabled prior to November 21, 2006.

### A. The ALJ's Determination that Plaintiff Did Not Meet or Equal a Listed Impairment

Plaintiff first argues that the ALJ erred in determining that his impairment did not establish disability under Listing § 1.02(A). Although the ALJ recognized that Plaintiff's fractured right hip

and femur constituted severe impairments, he found that Plaintiff failed to meet the severity and duration requirements of Listing § 1.02(A). The burden of proof for establishing that an impairment meets or equals the requirements of a listed impairment rests with the claimant. *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001); *see also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). To meet a listed impairment, a claimant must satisfy all of the criteria in the listing. *See Berry v. Comm'r of Soc. Sec.,* 34 Fed. Appx. 202, 2002 WL 857743, *203 (6th Cir. May 3, 2002)(unpublished); *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *Hale v. Secretary of Health & Human Servs.*, 816 F.2d 1078, 1083 (6th Cir. 1987).

The ALJ determined that the medical record did not support a finding that Plaintiff's impairment satisfied all of the criteria of Listing § 1.02(A). Listing § 1.02(A) states in relevant part:

> *Major dysfunction of a joint(s) (due to any cause):* characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With
> > A. Involvement of one major peripheral weight-bearing joint (i.e. hip, knee, or ankle), resulting in inability to ambulate effectively, **as defined by 1.00B2b**

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02(A) (emphasis added).

Plaintiff claims that his use of a cane indicates an inability to ambulate effectively, thus fulfilling the criteria of Listing § 1.02(A). As the ALJ determined, however, his impairment does not demonstrate the degree of extreme limitation required by 1.00B2b:

> **1.00B2b** - *What We Mean by Inability to Ambulate Effectively*
> (1) *Definition.* Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of **both** upper extremities.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00B2b (emphasis added).  The ALJ found substantial evidence in the medical record demonstrating that Plaintiff's inability to ambulate did not fall within the Listing's definition.  In example, following his initial surgery in May 2004, Plaintiff transitioned from a wheelchair to crutches to a cane within three months (Tr. 48).  Dr. Kelly, Plaintiff's treating physician, noted that the cane was medically necessary only for pain, not to correct ambulation impaired by abnormal gait (Tr. 211).  Although Plaintiff still uses the cane, it only limits the functioning of one of his upper extremities.

The ALJ further concluded that Plaintiff failed to meet the severity requirement of Listing § 1.02(A), as the medical record documented continuous healing and increased ability to ambulate.  Treatment notes indicated that as Plaintiff's fracture healed, his mobility steadily improved (Tr. 21, 139, 158).  In January 2005, following his second surgery, Dr. Kelly noted that Plaintiff's leg was healing and that he was able to walk fast without difficulty (Tr. 139).  If pain due to Plaintiff's impairment significantly affected his ability to ambulate, it appeared to be well controlled by medication and treatment (Tr. 117, 218, 219).  For instance, throughout 2006, Plaintiff reported taking only two Percocet daily to relieve pain (Tr. 219, 239).  In addition, Dr. Kelly saw no need to adjust Plaintiff's pain medication (Tr. 224).  Notably, Plaintiff's own testimony during the administrative hearing supported the ALJ's determination that Plaintiff did not meet Listing § 1.02(A).  Plaintiff admitted that since his second surgery in November 2004, he had been able to walk approximately one quarter of a mile without his cane, though it would be less comfortable than with it (Tr. 51).  This admission strongly supports the ALJ's finding that Plaintiff did not meet the degree of severity required by Listing § 1.02(A).

The ALJ also found that Plaintiff failed to meet the durational requirement of Listing § 1.02(A).  The ALJ noted that the record failed to show a continuous period of 12 months or longer

during which Plaintiff could not ambulate effectively. To establish disability under Listing § 1.02(A), Plaintiff must fulfill this requirement. The medical evidence, however, did not support Plaintiff's allegations of ongoing disability. For example, Plaintiff's treating physicians expected his impairment to last for fewer than nine months and even projected a return-to-work date in early March 2005 (Tr. 146, 178). In addition, the medical record demonstrated that Plaintiff's fractures healed quickly, as expected, and permitted increased mobility by February 2005 (Tr. 139, 178-79, 181, 222).

Based upon the above, Plaintiff's claim that the ALJ erred in determining that his impairment did not meet Listing § 1.02(A) is not well taken. The ALJ sufficiently articulated why Plaintiff did not meet the requirements of Listing §§ 1.02(A) and 1.00B2b, and there is substantial evidence to support his conclusion.

### B. The ALJ's Decision Not to Obtain Medical Expert Testimony

Plaintiff next alleges that the ALJ was required to obtain the opinion of a medical expert ("ME") to determine whether Plaintiff's impairment attained medical equivalence with Listing § 1.02(A). In failing to present ME testimony, Plaintiff argues, the ALJ failed to comply with S.S.R. 96-6p and HALLEX I-2-5-39. Plaintiff's reading of HALLEX I-2-5-39 is correct. If an ALJ finds that an individual is not engaged in substantial gainful activity and has a severe impairment that does not meet the requirements of a particular listing, he is required to consider the opinion of an ME about medical equivalence. HALLEX I-2-5-39. However, under S.S.R. 96-6p, when the ALJ finds that an individual's impairment is not equivalent in severity to any listing, the requirement to receive ME opinion evidence into the record may be satisfied by a Disability Determination and Transmittal document, signed by a state agency physician. The signature of a state agency physician on this

form indicates that consideration of medical equivalence was given at the initial and reconsideration levels of review. S.S.R. 96-6p.

The regulations read together clearly indicate that the ALJ was not required to consult with an ME. Plaintiff's medical record was reviewed by state agency physicians on two separate occasions, in 2004 and 2005. On both occasions, state agency physicians signed Plaintiff's Disability Determination and Transmittal forms (Tr. 77-78). The ALJ accepted these signatures as indications that Plaintiff's impairment did not establish medical equivalence with Listing § 1.02(A), in accordance with the regulations.

### C. The ALJ's Determination as to Plaintiff's Credibility

Plaintiff also claims the ALJ erred in his credibility analysis. Specifically, Plaintiff alleges the ALJ improperly found Plaintiff's statements not credible as to his limited ability to ambulate and need to elevate his right leg while seated, prior to November 21, 2006. In doing so, Plaintiff argues, the ALJ failed to comply with S.S.R. 96-7p. Nonetheless, substantial evidence supports the ALJ's credibility determination and regulation compliance.

When a claimant's subjective complaints of pain are not supported by the medical record, the ALJ must make a credibility determination. S.S.R. 96-7p. In assessing a claimant's credibility, the ALJ may evaluate the claimant's statements in conjunction with the following: medical signs and laboratory findings; diagnoses and other medical opinions provided by treating physicians; claimant's daily activities; and the location, duration, frequency and intensity of the symptoms. *Id.* One strong indication of a claimant's credibility is his consistency, both internally and with other information in the case record. *Id.*

Plaintiff argues that the ALJ improperly discounted his credibility, despite the fact that his allegations remained consistent throughout the record of evidence. The ALJ considered all of

Plaintiff's complaints and the extent to which they could reasonably be accepted as consistent with the objective medical evidence, as required by S.S.R. 96-6p.  In doing so, the ALJ determined that the medical record frequently contradicted Plaintiff's claims, proving his allegations of severe pain and inability to ambulate inconsistent with the weight of medical evidence.  The ALJ ultimately found that "[Plaintiff's] medically determinable impairments could reasonably be expected to produce the alleged symptoms, but his statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible" (Tr. 20).  An ALJ may properly discount a claimant's credibility where he finds contradictions among the medical reports, claimant's testimony, and other evidence. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997) (citing *Bradley v. Secretary of Health & Human Servs.*, 862 F.2d 1224, 1227 (6th Cir. 1988)).

First, the ALJ found that the medical record did not support Plaintiff's allegation of impaired mobility.  Plaintiff's treating physicians consistently noted improved mobility and reduced pain as Plaintiff's fractures healed (Tr. 21, 139, 158, 211).  In February 2005, a state agency physician opined that Plaintiff's assertion that he cannot ambulate was contrary to the medical record (Tr. 210). Even Plaintiff's own hearing testimony proved inconsistent with the degree of impairment he alleged.  In his hearing testimony, Plaintiff stated he was capable of standing on his feet for half an hour to forty-five minutes, and walking for a quarter of a mile with or without his cane (Tr. 55-56). The ALJ found this to be inconsistent with Plaintiff's alleged inability to ambulate effectively.

Plaintiff also alleged in his hearing testimony that he was capable of sitting straight up in a chair for only half an hour, unless able to sit in a nearly reclining position with his right leg fully extended.  The ALJ noted that this self-assessment was even more restrictive than Dr. Kelly's initial evaluation, made in June 2004.  That assessment concluded that Plaintiff could sit for two hours without interruption (Tr. 144).  The ALJ found no documentation in the medical record that Plaintiff

was unable to sit in a normal fashion, and noted that Plaintiff offered no proof to corroborate his claim.  In fact, this sitting restriction was never mentioned by Plaintiff or his doctors before Plaintiff's hearing date.  An ALJ need not fully credit a subjective complaint where there is no underlying medical basis. *Hare v. Comm'r of Soc. Sec.*, 37 Fed. Appx. 773, 775 (6th Cir. 2002) (citing to *Fraley v. Secretary of Health & Human Servs.*, 733 F.2d 437, 440 (6th Cir. 1984)).  Thus, in forming Plaintiff's RFC, the ALJ reasonably declined to include this limitation.

Second, the ALJ found that Plaintiff's overall credibility was marred by his attempt to conceal an extensive history of alcohol abuse to the Social Security Administration ("SSA") and the ALJ.  The ALJ determined that Plaintiff was less than forthright about his alcohol consumption and at times downplayed the amount he consumed.  For instance, on his application for Social Security benefits and in telephone conversations with SSA employees, Plaintiff reported minimal and occasional drinking (Tr. 120, 123).  In his hearing testimony, Plaintiff was evasive about his alcohol consumption, claiming to not remember the last time he drank enough to get drunk (Tr. 67).  Plaintiff's medical record, however, contained numerous reports of alcohol abuse.  Plaintiff had been diagnosed with alcohol abuse, alcoholism, and alcohol withdrawal on multiple occasions (Tr. 146, 151, 161, 186, 216, 229, 231, 235).  In fact, one month prior to his administrative hearing, Plaintiff had been emergently hospitalized for an episode of alcohol-induced confusion, initially thought to be a minor stroke (229-248).  The ALJ concluded that Plaintiff's allegations of disabling pain and physical limitations were rendered less than fully credible by virtue of concealing his alcohol abuse.  As such, the ALJ determined that Plaintiff was not credible in alleging an incapacity to perform any sustained work activity.

Based on the above, the Court finds that substantial evidence supports the ALJ's determination that Plaintiff was not disabled prior to November 21, 2006.

## VI. **DECISION**

For the foregoing reasons, the Magistrate Judge finds that the decision of the Commissioner is supported by substantial evidence. Accordingly, the decision of the Commissioner is AFFIRMED.

s/ Kenneth S. McHargh
Kenneth S. McHargh
United States Magistrate Judge

Date: July 29, 2008